**IN RE: W.O.L.F., Debtor.**

**Bankruptcy Case No. 14–23662 EEB**

United States Bankruptcy Court,
D. Colorado.

Signed July 25, 2017

---

David R. Eason, Jeffrey Weinman, Denver, CO, for Debtor.

Paul Moss, Denver, CO, for U.S. Trustee.

## ORDER INTERPRETING PLAN PROVISION

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER comes before the Court on the Debtor's Motion for Determination of Effect of Confirmed Plan on Partition of Debtor's Property. The parties have asked this Court to determine whether the plan's language, which mirrors 11 U.S.C. § 1141(c)[1] and vests property of the estate in the Debtor upon confirmation "free and clear" of claims and interests, extinguishes the partition rights of a co-owner of real property. Both the Debtor and Mr. Frank Wendland ("Wendland") hold an undivided one-half interest in real property on which the Debtor conducts its non-profit business. For the reasons set forth below, the Court hereby FINDS and CONCLUDES that the "free and clear" language in the statute and the plan do not eliminate whatever state law partition rights Wendland may possess as a co-owner.

## I. BACKGROUND

Debtor is a non-profit corporation that provides a sanctuary for wolves and hybrid wolf-dogs. Wendland and his now ex-wife, Patricia Lanteri ("Lanteri"), started to rescue these animals by providing a home for them in their backyard. Eventually, they formally incorporated the Debtor to carry on this mission. As Debtor rescued more animals, it became necessary to relocate to a larger property. In 1994 and 1995, Lanteri purchased four parcels of land for a total purchase price of $211,900 (collectively, the "Real Property"). Although the Real Property totals over 170 acres, the Debtor only uses about five acres, which is known as the "Fletcher Parcel." Those five acres contain animal enclosures and a cabin. For many years, this cabin served as both the Debtor's headquarters and as a home for Wendland and Lanteri.

The Real Property is in a remote mountainous area of Colorado, only accessible by a private dirt road that crosses neighboring parcels. In 1999, county officials advised Debtor that it needed a special use permit to operate an animal sanctuary. The permit it ultimately granted placed significant restrictions on Debtor's operations, including a limit of thirty animals, a limitation of access to seven round trips per day, and a prohibition against use of the road by buses or vans. Later neighbors sued Lanteri over use of the dirt road. She settled the litigation by agreeing that the

---

1. All references to "section" and "§" shall refer to Title 11, United States Code, unless expressly stated otherwise.

Debtor would be restricted to only five round trips per day.

In 2007, Wendland and Lanteri began discussing divorce. Lanteri wanted to protect the Real Property for Debtor's continued use and to ensure that it would pass to Debtor after her death. To accomplish this goal, she transferred ownership to a revocable trust, giving the Debtor a remainder interest that would vest on the twenty-first anniversary of her death. While this may have been Lanteri's original intent, it changed sometime before the end of the couple's divorce. On October 27, 2008, Wendland and Lanteri signed a series of documents that essentially set aside the transfer to the Trust and extinguished Debtor's remainder interest. Lanteri agreed to transfer a fifty-percent interest in the Real Property from her Trust to Wendland. On the same day, they also executed a purchase and sale agreement, selling both of their fifty-percent interests to Debtor. The total purchase price was $481,000, evidenced by two promissory notes—one to Wendland in the amount of $240,500 and one payable to Lanteri in the amount of $228,000. The Debtor secured both notes with a deed of trust. The sale documentation expressly reserved for Wendland a life estate in the Fletcher Parcel, allowing him to occupy the cabin during his lifetime.

At the time of entering into this sale and loan transaction, Wendland and Lanteri were the only directors of Debtor. As such, they signed the documents individually as the sellers and on Debtor's behalf as the buyer. Five months later, after Debtor had elected outside directors, Wendland and Lanteri obtained a consent resolution from those directors, retroactively approving the transaction. Wendland, however, did not disclose several material aspects of the transaction to these outside directors.

On June 9, 2012, a major forest fire broke out in the area, requiring the Debtor to evacuate its facilities and to move the animals under its care. The Debtor relocated most of the animals to the home of one of its directors. After the fire abated, a disagreement arose between Wendland and Debtor's board regarding the return of the animals. In the heat of the disagreement, Wendland tendered his resignation as president and as a director.

The fire, which came to be known as the High Park Fire, did substantial damage to the Real Property. It burned or scorched trees and vegetation, buildings and fencing, equipment, and items of personal property. Lacking vegetation, the Real Property flooded on a number of occasions in 2012 and 2013, resulting in substantial ash deposits, damage to ponds and an associated spillway, and damage to the dirt road. As a result, Debtor had to perform substantial repair and restoration work. The Debtor submitted claims against its insurance policy for reimbursement of its repair expenses and compensation for its damages.

Following Wendland's July 2012 resignation, the relationship between Wendland and Debtor continued to deteriorate. Wendland presented Debtor's board with a list of demands, the majority of which the board rejected. Wendland then attempted to exclude Debtor from the cabin and related facilities. This required Debtor to install new facilities on the Fletcher Parcel. Wendland responded with attempts to evict the Debtor, which led the Debtor to file bankruptcy on October 7, 2014.

Wendland filed two claims in the bankruptcy, one for an unsecured debt based on undocumented loans and a second for a secured claim based on the Wendland note and deed of trust. As a secured creditor, he also claimed entitlement to the fire insurance proceeds. Shortly after the

petition date, Debtor filed an adversary proceeding, objecting to his claims and alleging its own claims against Wendland, Lanteri, the insurance carrier, and a former employee of Debtor. Debtor subsequently settled its claims against all defendants except Wendland. As part of its settlement with Lanteri, she quit claimed her one-half interest in the Real Property to Debtor.

Debtor and Wendland proceeded to trial on their claims and on Debtor's request for confirmation of its plan. The Court entered an order (the "Combined Order"), addressing all of the disputes between the parties. It found that the purchase and loan transaction was a conflicting interest transaction in breach of Wendland's fiduciary duties to the corporation and in violation of Colo. Rev. Stat. § 7–128–501(3). The Court held that none of the safe harbors in that statute had been satisfied. Wendland had failed to disclose the material terms of the transaction when he sought ratification of it by the outside directors. Moreover, the transaction had not been fair to the Debtor. Among other things, it obligated the Debtor to pay twice the value of the property and gave it far more land than it could ever use. The Debtor requested rescission of the transaction rather than damages and so that was the relief the Court imposed. The Court also ruled that the Debtor did not owe Wendland on any undocumented loans and, in fact, Wendland owed the Debtor. It also declared the ownership of items of personal property of minimal value and ruled that the Debtor was the only party entitled to the insurance proceeds. Finally, the Court confirmed the Debtor's plan of reorganization.

The Combined Order specified the nature of the rights of both Wendland and the Debtor to the Real Property. Rescission resulted in a return to the status quo just prior to the sale and loan transaction, with Wendland and Lanteri being co-owners. Since Lanteri had subsequently quit claimed her interest in the land to the Debtor, this left Wendland and the Debtor as co-owners, with each having the right to full use of the Real Property. The Combined Order noted that this "is a somewhat untenable situation ... when they are at odds with one another. Neither party, however, requested to partition the property or order its sale under § 363(h). Thus, regrettably, further litigation may be necessary." Combined Order at 15.

Only a few months after plan confirmation, Wendland initiated litigation in state court to partition the land. The Debtor opposed it in part on the ground that the terms of the confirmed plan vested the property of the estate in the Debtor "free and clear of all claims and interests." Debtor contends that this language eliminated any right Wendland had to seek partition under Colo. Rev. Stat. §§ 38–28–101 *et seq.* The parties then agreed to return to this Court for an order interpreting this language.

## II. JURISDICTION

■ Although both parties agreed to seek this Court's determination, Wendland's Response equivocates as to whether this dispute truly "arises under" the Plan for jurisdictional purposes. 28 U.S.C. § 157(a), (b)(1) (2012). He acknowledges that "[n]o one denies that under the Amended Plan this Court retains exclusive jurisdiction 'to determine all controversies, suits and disputes that may arise in connection with or interpretation enforcement or consummation of the Plan ....'" Response at 5 (citing Amended Plan at §§ 8.36, 10)). However, Wendland hedges, asserting that, while this Court has jurisdiction to interpret and enforce its prior orders, it may do so only to the extent that "it deals with W.O.L.F.'s undivided one-

half interest ...." *Id.* Wendland's fifty-percent interest, he argues, "is not the subject of W.O.L.F.'s bankruptcy Plan, nor is it appropriate for this Court to step in to deny Mr. Wendland rights ...." *Id.* at 5–6. His argument is based in part on the language of § 1141(a), which states that a confirmed plan is binding on "any entity acquiring property under the plan [or] any creditor," and Wendland argues that he fits neither category. 11 U.S.C. § 1141(a). Despite these equivocations, "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009). This includes an interpretation as to the scope of the "free and clear" language.

## III. DISCUSSION

█ In the first year of law school, every lawyer learns the fundamental principles of real property law. One of these principles is the concept of the bundle of sticks. An owner of land does not possess only one right in the land, but many interests or rights, each of which represents a single stick in his bundle. These include, without limitation, the right of possession, the right of control, the right of exclusion, the right of enjoyment, the right to convey a security interest in the land, and the right of disposition. One of the lesser employed interests is the right to seek partition of the land. The need for partition usually only arises when two or more parties hold undivided joint interests in the land. Under certain conditions, a co-owner may ask a court to partition their interests or, if that is impracticable, then to order the sale of the jointly owned property. Wendland has asked the state court to allow him to exercise this right as a co-owner. The Debtor acknowledges that Wendland is a co-owner, but seeks a declaration from this Court that confirmation of

its chapter 11 plan somehow extinguished or removed the partition stick from Wendland's bundle.

The Bankruptcy Code provides that one of the effects of confirmation of a chapter 11 plan is the extinguishment of certain interests in the Debtor's property. In particular, § 1141(c) states:

> Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

11 U.S.C. § 1141(c). The exceptions in § 1141(d) are not applicable to this case. Thus, the Court's inquiry must begin with an assessment of whether the Real Property constitutes property "dealt with by the plan." Neither party disputes that the plan in this case dealt with the Real Property as the Combined Order declared the nature of both Wendland's and the Debtor's interest in it and provided that the Debtor would continue to operate its business on it while it repaid its creditors. Next the Court must address the scope of the "free and clear" language. Finally, if the "free and clear" language of § 1141(c) would otherwise extinguish an interest, then the Court must determine whether there was anything in the plan or the Combined Order that expressly provided for the retention of that interest.

The "free and clear" provision in § 1141(c) is not without limits. It eliminates only the claims and interests of three types of persons: (a) creditors; (b) equity security holders of the debtor; and (c) general partners in the debtor. 11 U.S.C. § 1141(c). The Debtor in this case is a non-profit charitable organization. As such, it

has neither equity security holders nor general partners. Thus, the only applicable portion of the statute is that pertaining to claims or interests held by creditors. Contrasting this statute with another Bankruptcy Code provision highlights the limits of § 1141(c). In § 363(f), the Code provides that a trustee may sell property of the estate "free and clear of any interest in such property of any entity other than the estate" if certain conditions are met. 11 U.S.C. § 363(f). This statute does not limit its reach to creditor claims.[2] Thus, as it pertains to this case, § 1141(c) would only eliminate the claims and interests of the Debtor's *creditors* in the Real Property.

■ The Bankruptcy Code defines a "creditor" as "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10). It defines a "claim" as "a right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment," regardless of whether the claim has matured, been reduced to judgment, is disputed, unliquidated or contingent. 11 U.S.C. § 101(5). Congress intended that courts interpret the term "claim" very broadly. *Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). Nevertheless, it must remain tethered to a right to payment—a debt or an obligation—owed by the debtor to another entity.

Admittedly, Wendland asserted creditor claims against both the Debtor and the Real Property throughout the bankruptcy case. It was not until the Court entered its Combined Order that he lost his creditor

status. Since he asserted the rights of a creditor, the Debtor asks this Court to hold that § 1141(c) eliminated *any* interest he held in the Real Property at confirmation. To hold this, however, the Court would have to rule that § 1141(c) also has the power to extinguish ownership rights. The Debtor provided no supporting authority for this proposition and the scope of § 1141(c) does not extend this far.

Consider the implications of the Debtor's reasoning. Imagine a debtor filed for chapter 11 protection, listing as one of his assets an interest in real property. In reality, he held only a ten-percent undivided interest in it, with nine other co-owners holding the remaining ninety-percent interest. Since the debtor did not owe a debt to the other nine, he does not list them as creditors on his schedules. Consequently, they do not receive any notice of the bankruptcy filing. The debtor then confirms his plan, retaining his ownership interest in this real estate. Neither the plan nor the confirmation order make any mention of the interests held by the other nine. Would the debtor in this hypothetical then own 100% of the real estate "free and clear" of the interests of the other nine who had no idea that their interests were in jeopardy? If such logic prevailed, then bankruptcy would surely become a much sought-after tool for strategic investors.

Nor is a right of partition solely a creditor's remedy. Section 38–28–101 of the Colorado Revised Statutes states that "[a]ctions for the division and partition of real or personal property or interest therein may be maintained by any person hav-

---

**2.** Admittedly, § 363(h) specifically addresses a trustee's ability to sell property that is co-owned and in which the debtor holds an undivided interest. It allows the trustee to partition or sell both the estate's interest and the co-owner's interest under certain conditions. As the more specific statute targeting a

particular issue, it would control over the more general provision in § 363(f). *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524–26, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). However, the Court refers to § 363(f) only to emphasize the difference in the scope of its "free and clear" language.

ing an interest in such property." Colo. Rev. Stat. § 23–208–101. Arguably, the statute's language is broad enough to include the possibility of a creditor asserting a right to partition based on its lien rights against the property, but it is most commonly used by persons holding undivided ownership interests in the property. Nevertheless, if Wendland were asserting his right to partition based on a creditor interest, then § 1141(c) would prevent him from doing so. In this case, however, he is invoking a right to partition based solely on his co-ownership interest.

The final prong of the Court's inquiry is to determine whether the plan or the Combined Order made express provisions for Wendland's interest. However, § 1141(c) only requires the Court to examine the plan and its Order to see if it expressly retains an interest when § 1141(c) would otherwise eliminate it. Since the Court has held that § 1141(c) does not eliminate ownership interests, this final inquiry is unnecessary in this case.

Alternatively, the Debtor requests that this Court instruct the state court that any form of partition or sale may not impair the Debtor's business or hinder its reorganization in any way. First, the Debtor's reorganization appears to be complete. Its Amended Plan set forth the specific treatment each class of claims would receive. It stated that Wendland's secured claim in Class 1 would remain unimpaired unless the Court disallowed his claims, which it did. His Class 2 unsecured claim, if allowed, would receive payment on the same terms as Class 5. Since the Court disallowed his Class 2 claim, the Debtor has no further obligation to repay it. For Class 3, it incorporated its settlement with Lanteri, which required the Debtor to pay her $15,000 for her one-half interest in the Real Property. Presumably, the Debtor has made this payment as it was required

to do so long ago and she has not come forward to declare the plan in default. For Class 4, the Debtor committed to pay its small claims under $2,000, if any, in full within one year of the effective date of the plan. The effective date was sixty days from the January 29, 2016 confirmation date, or March 29, 2016. Thus, this payment to any small claims was due no later than March 29, 2017. Finally, as to Class 5, which included all non-priority unsecured claims over $2,000, it provided that the Debtor would pay these claimants ten percent of their claims. Class 5 claims totaled less than $20,000. Even though the plan scheduled payments to Class 5 over the course of five years, the Debtor's Chapter 11 Final Report and Motion for Final Decree indicated that it had already paid these creditors $4,000, which is in excess of the required plan payments over the five-year period.

██ With reorganization complete, a state court ruling on partition or sale rights will have no effect on the Debtor's ability to fulfil its plan obligations. What the Debtor is actually requesting is that the bankruptcy court stop the state court from making a ruling that would impair its non-profit business in the future. The Bankruptcy Code does not promise this form of protection. A bankruptcy filing shields a debtor from creditor attacks based on pre-petition debts. It is not to be used by a debtor as either a shield or a sword to defeat the post-confirmation actions of courts, regulatory agencies, co-owners, and post-petition creditors.

## IV. CONCLUSION

For the foregoing reasons, the Debtor's request for plan interpretation is GRANTED but the Court holds that neither § 1141(c) nor the Debtor's Amended Plan extinguished Wendland's co-ownership interest in the Real Property. Nothing in the

Plan, the Combined Order, or this statute prevents Wendland from seeking partition or sale in the state court.